**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,

            Plaintiff,

    v.

ACTION SECURITY, INC., and SCOTT
HENKE,[1]

            Defendants.

Case No. 3:19-cv-00134-HRH-KFR

**REPORT AND RECOMMENDATION**

    The Court recommends that Plaintiff's Motion for Sanctions to Dissolve Defendant Action Security, Inc. be **GRANTED**. The Court finds that Defendants have repeatedly violated the orders of the District Court, have consistently engaged in actions designed to frustrate the execution and intent of the District Court's orders, and have willfully refused to abide by their obligation to pay taxes due on income made during their business operations. Because Defendants through their actions have demonstrated that they are unwilling or unable to abide by the District Court's orders, and because there is no reasonable lesser sanction that can be imposed in this case to compel compliance, the Court recommends the following:

- a permanent injunction against Defendants;

---

[1] The Court notes that Defendant Action Security has never made an appearance in this action and that corporations may not proceed *pro se*, rather they must be represented by counsel. Nonetheless, the Court finds that Defendant Action Security is properly before this Court. The Court has given Defendant Action Security ample opportunity to seek counsel and make an appearance in this action. In addition, Mr. Henke stipulated on behalf of Defendant Action Security to the injunction in this case (thereby properly joining Defendant Action Security) and is considered its privy or actor-in-concert under Rule 65(d)(2)(C). Furthermore, the government properly served Defendant Action Security by delivering the complaint and summons to its registered agent, Mr. Henke, in the District of Alaska. At that point, the Court's personal jurisdiction over Defendant Action Security solidified.

- that Defendants cease accepting new clients within 30 days, cease operating within 120 days, and conspicuously display at Action Security's entrance notice of the injunction;

- that Mr. Henke not be permitted to directly or indirectly own, control, manage, operate, or serve as an officer or director of any business until the earlier of (1) his successful petition for relief if certain conditions are met after one year from the injunction; or (2) 10 years; and

- that Mr. Henke be incarcerated for one or more days if he violates the injunction, with periods of incarceration increasing for successive violations, based on the seriousness of those violations.[2]

## I.      PROCEDURAL BACKGROUND

On May 13, 2019, Plaintiff, United States of America, filed a Complaint for Permanent Injunction against Defendants Action Security, Inc. and its owner, Scott Henke, seeking to enjoin Defendants from continuing to pay wages to employees without paying the associated federal employment taxes.[3] Plaintiffs properly served Defendants; however, Defendants did not file an Answer or make a timely appearance.[4] As a result, Plaintiff filed a Motion for Entry of Default against Defendants.[5] The Clerk of Court entered an Order of Default and on September 18, 2019, Plaintiff filed a Motion for Default Judgment.[6] On September 23, 2019, Plaintiff filed a Stipulation for Entry of Permanent Injunction against Defendants and withdrew its Motion for Entry of Default Judgment.[7]

The Court issued a Judgment and Permanent Injunction against Defendants on September 25, 2019, with detailed directions to be regularly and consistently

---

[2] Doc. 87 at 31-32.
[3] Doc. 1.
[4] Docs. 8-9.
[5] Docs. 12-13.
[6] Docs. 14-16.
[7] Docs. 17-18.

Report and Recommendation                          2
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 2 of 50

completed by the parties (hereinafter "Injunction Order").[8]  The Court retained jurisdiction over the case for a five-year period to ensure compliance with the injunction.

One year later, Plaintiff filed a Motion for Order to Show Cause, alleging that Defendants failed to comply with the requirements of the Injunction Order.[9] Defendants did not timely respond.[10]  The Court solicited input from Plaintiff as to how to proceed given Defendants' failure to respond to the Court's order directing response,[11] and Plaintiff requested appointment of a receiver.[12]  The Court ordered Defendants to appear on March 22, 2022, "to show cause why they should not be held in contempt for their failure to comply with the [Injunction Order]."[13] Defendants failed to appear.[14]

On March 24, 2022, the Court granted Plaintiff's contempt motion, and the Court appointed Lisa Fink to act as a receiver (hereinafter "Appointment Order").[15] Ms. Fink's duties included ensuring Defendants complied with the Injunction Order and overseeing Defendants' business operations.[16]  The District Court's Appointment Order also gave Ms. Fink broad access to Defendants' business and authority over its operations.[17]   The Appointment Order also ordered Defendants' compliance, enjoining them from interfering with Ms. Fink in the exercise of her duties.[18]

Three months later, Ms. Fink filed a status report as directed by the District Court.[19]  Ms. Fink documented Mr. Henke's noncompliance with the District Court's Injunction and Appointment Orders.[20]  Ms. Fink concluded that the receivership was

---

[8] *See* Doc. 19.
[9] Doc. 20.
[10] Doc. 24.
[11] Doc. 21.
[12] Docs. 26-27.
[13] Doc. 28.
[14] Doc. 35.
[15] Doc. 37.
[16] *Id.* at 2-5.
[17] *Id.* at 5-8.
[18] *Id.* at 9.
[19] Doc. 39.
[20] Doc. 39-1 at 1.

"economically unfeasible" due to the "necessary cleanup and overhaul" the receivership required and the fact that she had "already spent 25 hours [working with Defendants] but accomplished little due to [Mr.] Henke's unresponsiveness."[21]

On July 12, 2022, Plaintiff filed a Motion for Sanctions to Dissolve Defendant Action Security, Inc.[22]  Mr. Henke requested additional time to respond to this motion, which the Court granted.[23]  Mr. Henke then filed a "Motion for Dismissal of Motion" requesting that Plaintiff's Motion to Dissolve his company not be granted, accompanied by an affidavit where he took issue with Ms. Fink's status report.[24]  Plaintiff replied and the Court set an evidentiary hearing.[25]

In the meantime, Ms. Fink filed a second status report, warning that she did not think the receivership was sustainable given Mr. Henke's non-compliance and avoidance, and Defendants requested time to secure counsel.[26]  The District Court granted Defendants' motion and reset the evidentiary hearing to November 30, 2022.[27]  On November 30, 2022, Mr. Henke made an oral motion to continue the evidentiary hearing.[28]  The Court directed the parties to confer and propose alternative dates for an evidentiary hearing.  The Court then referred the case to this Court for purposes of the evidentiary hearing and post-judgment proceedings.[29]

This Court held an evidentiary hearing on February 28 and March 1, 2023.[30]  At the hearing Plaintiff called Mr. Henke, IRS Revenue Officer ("RO") Terence Johnson, Ms. Fink, and Ms. Fink's assistant, Elizabeth Barr.[31]  Defendants called Mr. Henke.[32]  At the conclusion of the hearing this Court ordered the parties to file post-

---

[21] Id.
[22] Doc. 40.
[23] Docs. 41-42.
[24] Doc. 43.
[25] Docs. 45-46.
[26] Docs. 48-50.
[27] Doc. 51.
[28] Doc. 55.
[29] Doc. 61.
[30] Docs. 65-66.
[31] Docs. 65-67.
[32] Id.

Report and Recommendation
*United States of America v. Action Security, et al.*
4
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 4 of 50

hearing supplemental briefing with proposed findings of fact and conclusions of law.[33]

In accordance with the Appointment Order, Ms. Fink filed her third and final status report on March 22, 2023.[34]  In this report, Ms. Fink gave notice of her resignation due to Defendants' unwillingness to communicate or otherwise work with her or her team as instructed by the Court.[35]

## II.    STATEMENT OF FACTS

### a.  An Employer's Duty to Report and Pay Taxes

#### i.  941 Employment Taxes

Employers must withhold Federal Insurance Compensation Act ("FICA" or Social Security) taxes, Medicare taxes, and income taxes from their workers' paychecks.[36]  The employer then has until the end of each calendar quarter — either March 31, June 30, September 30, or December 31 — to forward its workers' taxes to the Internal Revenue Service ("IRS").[37]  Until then, the employer holds the money "in trust for the United States."[38]

An employer must also pay its own Social Security and Medicare taxes each quarter.[39]  Together with its workers' tax withholdings, these payments are called "employment taxes."  An employment tax return, IRS Form 941, comes due a month after the quarter ends.[40]  The IRS uses this return to determine the employment taxes owed for that quarter — and thus, whether the employer paid in full.

//

//

---

[33] Doc. 74.
[34] Doc. 73.
[35] *Id.*  The Appointment Order stated that the Receiver may file notice of her resignation; however, such resignation shall not be effective until the Court appoints a successor.
[36] *See* 26 U.S.C. §§ 3102, 3402.
[37] *See* 26 C.F.R. § 31.6071(a)-1(a); *see also* February 28, 2023 Evidentiary Hearing Transcript 49:7–8 (hereinafter "Feb. 28 Tr.").
[38] 26 U.S.C. § 7501.
[39] 26 U.S.C. §§ 3111, 3301.
[40] *See* 26 C.F.R. § 31.6071(a)-1(a); *see also* Feb. 28 Tr. at 48:21–22.

### ii. 940 Unemployment Taxes

Employers must separately pay Federal Unemployment Tax Act ("FUTA") taxes equal to 6% of their employees' wages.[41]  Depending on the amount owed, unemployment taxes must be paid either quarterly (every three months) or annually (by January 31).[42]  An unemployment tax return, IRS Form 940, must also be filed by the payment deadline.[43]

### iii. 1120 Corporate Income Taxes

Taxable corporations must file an annual corporate income tax return, IRS Form 1120.[44]

### b. Defendants' Business Falters and Fails to Comply with its Obligations to the IRS.

Mr. Henke's parents founded Action Security, Inc. in 1963.[45]  The firm was incorporated on or about November 25, 1974, and was administratively dissolved by the State of Alaska on or around October 1, 2016.  The firm then began operating under the name "Action Security."  Action Security provides locksmith and security services.  Mr. Henke acquired shares of the company over the years and eventually became its sole owner, director, president, secretary, shareholder, and treasurer in 2016.[46]

Between 2010 and 2016, Mr. Henke litigated his divorce proceedings, which resulted in him being able to keep Action Security, but required him to make a payout to his ex-wife that he reported to be more than $2 million.[47]  The result, according to Mr. Henke, was "financial ruin"[48] for him and Action Security, which led to the

---

[41] *See* 26 U.S.C. § 3301.
[42] *See* 26 C.F.R. § 31.6302(c)-3(a).
[43] *See* 26 C.F.R. § 31.6071(a)-1(a).
[44] *See* 26 C.F.R. § 1.6012-2(a); *see also* Feb. 28 Tr. at 51:25-52:4.
[45] March 1 Evidentiary Hearing Transcript 50:20-23 (hereinafter "Mar. 1 Tr.")
[46] Feb. 28 Tr. at 10:25–11:2; Mar. 1 Tr. at 50:25–51:6.
[47] Mar. 1 Tr. at 51:5-6; 5:21–6:7.
[48] *Id.* at 51:8-12.

closure of five Action Security offices throughout the State of Alaska and dismissal of 30 employees.[49]

In 2014, during the pendency of his divorce, Action Security ceased paying employment taxes or filing returns.[50] Defendants began spending taxes withheld from their employees' paychecks on their own expenses instead of forwarding the money to the IRS and they ceased filing or paying their own federal taxes.[51]

### c. The IRS Attempts to Recover Money Owed to It.

Between June 2016 and March 2019, the IRS undertook myriad efforts to bring Defendants into tax compliance, giving them repeated warnings of what might happen if they did not comply. Specifically, the IRS:

1. advised Mr. Henke on how to follow the Internal Revenue Code;

2. recorded multiple federal tax liens against Action Security between June 13, 2016, and March 27, 2019;

3. served notices of intent to levy Action Security's financial accounts and levied on Action Security's bank accounts and credit card merchant account;

4. assessed trust fund recovery penalties against Mr. Henke, under 26 U.S.C. § 6672, for multiple quarterly periods, making him personally liable for Action Security's unpaid 941 employment taxes withheld from the wages of its employees;

5. threatened to sue for an injunction if Defendants did not file returns and pay taxes; and

6. delivered an IRS Letter 903 and Notice 931 to Defendants on October 12, 2017, which placed Action Security on notice that the IRS might

---

[49] *Id.* at 5:24–6:1.
[50] Feb. 28 Tr. at 113:1-8.
[51] *Id.* at 161:10-22.

pursue a suit for civil injunction if Action Security continued to fail to comply with its employment tax obligations.[52]

None of this persuaded Defendants to file their tax paperwork or pay the IRS and Action Security's tax debt continued to grow.[53] As a result, on May 13, 2019, Plaintiff filed a Complaint to enjoin Defendants from continuing to pyramid their federal tax debt.[54] To that point, Mr. Henke and Action Security had failed to report or pay employment taxes (Form 941) from the fourth quarter of 2014 onward; unemployment taxes (form 940) for 2015 and 2017 onward; and corporate income taxes for fiscal year 2014 onward.[55]

Defendants initially ignored Plaintiff's lawsuit.[56] After the Clerk entered a default judgment against Defendants,[57] the government notified Mr. Henke in writing of the default judgment and suggested in a letter that the parties resolve the pending case with a stipulated injunction rather than a default judgment.[58] The letter included a proposed stipulation and injunction.[59]

After approximately one week of negotiation over its terms, and the exchange of three drafts, Mr. Henke stipulated to the injunction.[60] The District Court entered the Stipulated Injunction on September 25, 2019.[61] The Stipulated Injunction included the following terms:

1.     Defendants shall properly withhold from their employees' paychecks appropriate amounts of income tax and FICA and Medicare taxes;

---

[52] Doc. 40 at 4-5; Doc. 15 at 4.
[53] Feb. 28 Tr. at 43:11-20.
[54] Doc. 1.  The term "pyramiding" refers to the accumulation of tax liability from each successive failure to remit payments.  One cause for a pyramiding tax debt can be the lack of profit or capital for operating costs, forcing the business owner to use funds that should be deposited into employment tax trust accounts to pay bills, resulting in an accumulation (or "pyramiding") of tax liabilities.  *See* IRS Publication IR-2004-47 (Apr. 5, 2004), available at https://www.irs.gov/pub/irs-news/ir-04-047.pdf.
[55] *See* Doc. 68, Ex. 4 at 1-89.
[56] Docs. 8, 9.
[57] Doc. 14.
[58] Doc. 16; Doc. 16-1 at 2.
[59] *See* Doc. 16-1 at 5-6.
[60] Docs. 16-1, 17.
[61] Doc. 19.

Report and Recommendation                                                        8
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 8 of 50

2.      Defendants shall deposit in an appropriate bank employee taxes, employer FICA and Medicare taxes, and FUTA taxes;

3.      Defendants shall sign and deliver to the IRS on the first of every month an affidavit stating that the required income, FICA and Medicare, and FUTA taxes had been properly deposited for each pay period during the prior month;

4.      Defendants shall timely file IRS Forms 941 and 940 and provide a copy of the filed forms to the IRS within five days of filing;

5.      Defendants shall pay all required outstanding liabilities due on each tax return filed pursuant to the District Court's order;

6.      Defendants shall not pay other creditors prior to paying amounts owed to the IRS;

7.      Defendants shall not pay employee salaries except through an approved payroll services provider;

8.      Defendants shall permit periodic inspection by the IRS of its books and records; and

9.      Mr. Henke shall inform the IRS if he forms, incorporates, or works in a managerial capacity for any other business.[62]

The District Court told Defendants that failure to abide by the Stipulated Injunction could result in "a motion for an order to show cause why Defendants should not be held in contempt[.]"[63] The District Court stated that possible sanctions for violating the order included being ordered to "cease doing business immediately" and being "permanently enjoined from forming, incorporating, or owning another business entity and working for any business in [any tax-related capacity.]"[64]

---

[62] *Id.* at 2-4.  The Court adopted the language contained in the Proposed Order submitted by the parties with their Stipulation for Entry of Permanent Injunction.  *See* Doc. 17.
[63] Doc. 19 at 5.
[64] *Id.*

Report and Recommendation                                          9
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 9 of 50

Mr. Henke did little to nothing to comply with the Stipulated Injunction. On October 30, 2019, RO Johnson traveled to Anchorage from his duty station in the Lower 48 to review the terms of the injunction with Mr. Henke.[65] Revenue Officer Johnson scheduled a follow-up trip to Alaska to meet with Mr. Henke on Tuesday, November 19; however, after RO Johnson's arrival on Monday, Mr. Henke cancelled that meeting.[66] When RO Johnson responded that he could meet any day that week, Mr. Henke said that he was unavailable.[67] A follow-up meeting between RO Johnson and Mr. Henke never occurred.[68]

For the next two and a half years, Mr. Henke continued to fail to comply with the injunction. During this period, Mr. Henke and Action Security paid the IRS exactly twice.[69] Both times were in November 2019 and totaled $2,563.40.[70] All the while, Action Security continued operating as a business, paying other expenses like rent and utilities[71] and withholding its employees' federal tax withholdings. Action Security did not file any federal tax returns during this period.[72]

Attempts by the government to force compliance by Mr. Henke with the terms of the injunction were met with avoidance, resistance, and deception. In June 2020, the government sent a letter to Mr. Henke informing him that he had not paid all employment taxes for the third and fourth quarters of 2019, filed Action Security's tax returns, or sent RO Johnson the required documents, all of which were required under the Stipulated Injunction.[73] Mr. Henke replied that he had submitted the unemployment tax returns for the second half of 2019 but would be "more than happy to resend them," and that he would contact RO Johnson in the morning.[74]

---

[65] Feb. 28 Tr. at 64:6-12.
[66] *Id.* at 65:1-9.
[67] *Id.* at 65:10-17.
[68] *Id.*
[69] Feb. 28 Tr. at 63:6–64:5.
[70] Doc. 68, Ex. 4 at 2.
[71] Feb. 28 Tr. at 19:2–7.
[72] Doc. 68, Ex. 4 at 1–89; *see also* Mar. 1 Tr. at 46:3–5.
[73] Doc. 20-1 at 2.
[74] *Id.* at 2, 16; *see also infra* notes 69-70.

Report and Recommendation                                              10
*United States of America v. Action Security, et al.*
Case No. 3:19-cv-00134-JMK
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 10 of 50

Twelve days later, after ignoring the government for four of those days because "the fish [were] calling," and after the government threatened to seek an order to show cause, Mr. Henke finally sent receipts for his two 2019 payments.[75]   (Later accounting would determine that these payments were approximately $2,000 short.[76])   Mr. Henke also explained that he failed to meet with RO Johnson on November 19, 2019, because the two of them "got their dates crossed."[77]

Subsequent attempts by the government to communicate with Defendants went unanswered.   On July 20, 2020, the government sent a letter to Mr. Henke seeking the filing of Forms 941, questioning the sufficiency of the tax payments made in 2019, and reminding Mr. Henke that RO Johnson was waiting on documents.[78] The letter also included a table detailing to that point Defendants' numerous violations of the Stipulated Injunction.[79]   That letter went unanswered.[80]

### d. The Court Appoints a Receiver and Warns Defendant of the Consequences of Failing to Comply.

In October 2020, Plaintiff asked the Court to hold Defendants in contempt of the injunction.[81]   The Court ordered Defendants to respond to the motion within 14 days, and to appear at the contempt hearing, but Defendants did neither.[82]   The Court found Defendants in contempt and appointed a Receiver, Lisa Fink, on March 24, 2022, to ensure Defendants' compliance with the Stipulated Injunction going forward.[83]

In the Appointment Order, the District Court ordered Defendants to work with Ms. Fink and enjoined them "from interfering in any manner with the discharge of

---

[75] *Id.* at 2, 21, 24.
[76] Doc. 68, Ex. 4 at 86.
[77] Doc. 20-1 at 3, 24.
[78] *Id.* at 3, 37-38.
[79] *Id.*
[80] *Id.* at 6.
[81] Doc. 20.
[82] Docs. 21, 24, 28.
[83] Docs. 36-37.

Report and Recommendation                                          11
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 11 of 50

the Receiver's duties and exercising [of] her authorities."[84]  Among other things, the Appointment Order granted Ms. Fink keys to and the alarm code for Action Security's premises, access to its books and records, and copies of all mail and correspondence.[85]  Additionally, the Court granted Ms. Fink authority to implement "accounting and control procedures to facilitate the efficient and proper administration of Action Security."[86]   Like the Stipulated Injunction, the Appointment Order again warned Defendants of the consequences of failing to comply.  Specifically, the Appointment Order stated,

> [i]n the event Action Security remains in violation of the Injunction Order, the Receiver shall take reasonable and appropriate steps to cure those violations as soon as possible. **If the Receiver is unable to cure those violations and determines that Action Security is unable or unwilling to comply . . . the United States shall immediately seek the permanent closure of Action Security.**[87]

### e. Defendants Fail to Work with the Receiver in Violation of the Court's Order.

On April 26, 2022, Ms. Fink contacted Mr. Henke to set up an initial meeting.[88] During that call, Mr. Henke told Ms. Fink that he was not available for two weeks but would call to set up a meeting to take place during the week of May 9, 2022.[89] Mr. Henke did not call back, however, and only after calling Action Security on three occasions was Ms. Fink able to speak with Mr. Henke and arrange a meeting to take place at close of business on May 9, 2022.[90]  When Ms. Fink called on May 9, 2022, to remind Mr. Henke of this meeting, he asked to reschedule to close of business on the following day.[91]

---

[84] Doc. 37 at 8.
[85] *Id.* at 5-6.
[86] *Id.* at 7.
[87] *Id.* at 5 (emphasis added).
[88] Feb. 28 Tr. at 97:1-4, 8-11; Doc. 40-1.
[89] Doc. 40-1.
[90] Feb. 28 Tr. at 97:1-4; Doc. 40-1 at 2.
[91] Doc. 40-1 at 2.

Report and Recommendation                                    12
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 12 of 50

Ms. Fink and her assistant met with Mr. Henke on May 10, 2022. During this meeting, Mr. Henke showed Ms. Fink his accounting system, which consisted of using the desktop version of QuickBooks to generate employee paychecks and withhold those employees' federal taxes.[92] Mr. Henke did not use the other features of QuickBooks which would have allowed him to track invoices, debts, and profits and losses.[93] Also, because Mr. Henke used only the desktop version of the software, as opposed to a cloud-based system, Ms. Fink was unable to easily access the software remotely.[94]

Mr. Henke also explained that he used the point-of-sale platform Square[95] to process credit card payments and a Wells Fargo account for cash and check payments.[96] Payments from Square, which were the majority of payments received by Action Security, were then transferred to the Wells Fargo account as needed to pay rent, bills, and payroll.[97] The rest remained in the Square account to protect the money from creditors,[98] and was used to pay expenses through a debit card linked to that account.[99]

At the initial meeting on May 10, 2022, Ms. Fink gave Mr. Henke instructions to give her materials she needed to fulfill her obligations as a receiver.[100] The items Ms. Fink asked for included keys and alarm access codes for the Action Security shop; logins and passwords to Action Security's QuickBooks, Square, and Wells Fargo accounts; a summary of Action Security's inventory; a daily sales report; and a list of Action Security's invoices and debts.[101] Ms. Fink also told Mr. Henke to install

---

[92] Feb. 28 Tr. at 98:10-102:17.
[93] Feb. 28 Tr. at 98:25-99:6, 101:25-6.
[94] *Id.* at 109:8-13.
[95] Square is a business that allows retailers to process credit card payments through a retail terminal or other digital reader connected to a smart phone or tablet. *See* SQUARE, https://squareup.com/us/en (last accessed Jan. 5, 2024).
[96] Feb. 28 Tr. at 99:13-23, 100:1-4.
[97] *Id.* at 102:15-18; *see also* Doc. 68, Ex. 7.
[98] Mar. 1 Tr. at 54:9-12.
[99] Feb. 28 Tr. at 102:18-22.
[100] *Id.* 104:1-4; Doc. 40-1.
[101] Feb. 28 Tr. at 105:11–19, 116:24–117:5, 169:8–13; Doc. 40-1. Access to these items was explicitly ordered by the District Court in its order appointing Ms. Fink. Doc. 37 at 5-6.

RemotePC on his computer so she could access his desktop version of QuickBooks from her office.[102]  Mr. Henke said that he would "get it done."[103]

Ms. Fink then met with Mr. Henke later in May at a Wells Fargo Bank in order to get access to his bank account.[104]  At that point in time, the account had no money, and Mr. Henke had overdrawn it several times.[105]  The account statements also showed that Mr. Henke had made withdrawals from the account of approximately "$7,000, $8,000" soon after the receivership began.[106]  The account statements did not show any similar patterns of withdrawals before this.[107]  Mr. Henke told Ms. Fink that the withdrawals were for cashier's checks to pay vendors; however, he was unable to provide her with copies of those checks.[108]

Ms. Fink returned to Action Security on June 9, 2022, to log into QuickBooks from Mr. Henke's desktop computer and access information necessary to prepare delinquent tax returns.[109]  Working with Mr. Henke to access his financial records, Ms. Fink "pulled everything off QuickBooks" so that she could "prepare all of the 940s, all of the 941s that were due."[110]  That evening, Mr. Henke texted Ms. Fink: "Thank you for your help today. I appreciate the help."[111]

Ms. Barr, Ms. Fink's assistant, used Mr. Henke's payroll history to prepare every delinquent employment and unemployment tax return up to the first quarter of 2022 – the most recent deadline.[112]  Ms. Barr then brought Mr. Henke the completed returns to review and sign, which he did.[113]  As a result of these filings,

---

[102] Feb. 28 Tr. at 109:7-18.  RemotePC is software that allows a user at one internet-connected computer to access and run an internet-connected computer in another location. *See* REMOTEPC, https://www.remotedesktop.com/ (last accessed Jan. 5, 2024).
[103] Feb. 28 Tr. at 105:21.
[104] *Id*. at 105:25-106:1–11.
[105] *Id*. at 106:13-16.
[106] *Id*.  at 106:17–107:2.
[107] *Id*. at 157:9–13.
[108] *Id*. at 106:23-25.
[109] *Id*. at 107:7–108:2.  RemotePC access had not been provided.
[110] *Id*. at 107:20–108:2; Mar. 1 Tr. at 34:5–8.
[111] Doc. 68, Def. Ex. D.
[112] Feb. 28 Tr. at 107:20–108:9.
[113] *Id*. at 38:18–19, 199:14–16; Doc. 40-1 ¶ 19.

the IRS determined that Action Security owed $1,893,951.33 in unpaid employment taxes and $2,189.64 in unpaid unemployment taxes.[114]

This was the apex of Mr. Henke's cooperation with Ms. Fink and the last substantive action Ms. Fink was able to accomplish as Receiver. Despite her request, Mr. Henke failed to provide Ms. Fink with all of the items she requested during their initial meeting.[115] As a result, Ms. Fink was not able to prepare Action Security's corporate income tax returns because she had no data on the business's income.[116] Her lack of access also meant that she could not prepare the employment and unemployment tax returns that came due after the first quarter of 2022.[117]

In its Appointment Order, the District Court directed Ms. Fink to file periodic status reports.[118] In her first status report on June 24, 2022, Ms. Fink stated that in her professional opinion Mr. Henke showed "no desire to become whole on his federal tax debt," noting that it took multiple phone calls with Mr. Henke to arrange both her initial meeting in May 2022 and the follow-up meeting in June 2022.[119] Ms. Fink also described how Mr. Henke had failed to complete the "simple accounting tasks" she had instructed him to complete,[120] and had not given her the keys and codes to Action Security, nor had he given her passwords or completed an inventory.[121] In addition, Ms. Fink reported that Mr. Henke continued to misappropriate nearly all the federal taxes withheld from his employees' paychecks,[122] and further warned the District Court that Mr. Henke's unresponsiveness "may make this receivership economically unfeasible."[123]

---

[114] Doc. 68, Govt. Exs. 4 and 5.
[115] Feb. 28 Tr. at 111:17–22.
[116] Id. at 111:1-15.
[117] Id. 109:19–110:9.
[118] Doc. 37 at 9. The order directed a Status Report to be filed at the end of three months, six months, 12 months, 18 months, and 24 months after entry of the order.
[119] Doc. 39-1.
[120] Id.
[121] Id.
[122] Doc. 48-1 at 1.
[123] Doc. 39-1. Ms. Fink stated to the Court during the evidentiary hearing that a turning point for a company often occurs between three and six months of engagement. See Feb. 28 Tr. at 155:4-5. At that point, it becomes clear, "[t]hey either follow up or they avoid." Feb. 28 Tr. at 155:8.

United States of America v. Action Security, et al.
Case No. 3:19-cv-00134-JMK-KFR
15

Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 15 of 50

On July 12, 2022, Plaintiff moved for an injunction to permanently close Action Security and enjoin Mr. Henke from starting a new business.[124] In its motion, Plaintiff argued that it had already tried everything short of shuttering the business, yet Defendants' lawbreaking persisted.[125] Plaintiff asked the Court to (1) hold Defendants in contempt of the Stipulated Injunction, (2) dissolve Action Security, and (3) enjoin Mr. Henke from owning or operating another business for 10 years.[126] Shortly thereafter, Action Security missed the deadline to file a second quarter employment tax return.[127]

Mr. Henke submitted an affidavit on August 16, 2022, disputing the assertions made in Ms. Fink's status report and asking for more time to resolve the matter.[128] Mr. Henke asked the Court to deny the United States' motion, claiming that: (1) Action Security had filed all 941 tax returns; and (2) Action Security was current on its third quarter 941 taxes.[129] Mr. Henke claimed that Action Security's sales had increased "at the rate of 40%-50%...[a]llowing opportunity to repay IRS debt."[130] Mr. Henke also reported that prior to Ms. Fink's appointment, he had been "attempt[ing] to find legal and accounting support without any success."[131]

After reading Mr. Henke's affidavit, Ms. Fink proposed a new arrangement to him: If Mr. Henke gave the receivership another try, as he said he would, then he could work with her assistant, Ms. Barr, instead of Ms. Fink.[132] Ms. Fink saw her assistant as "the calming factor" and hoped that communicating through Ms. Barr would help compel Mr. Henke to take action.[133]

---

[124] Doc. 40.
[125] Doc. 87 at 18.
[126] Doc. 40.
[127] *Id.* Ex. 4 at 84–85; Feb. 28 Tr. at 50:3–12.
[128] Doc. 43.
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] Feb. 28 Tr. at 114:14-25.
[133] *Id.* at 153:23–154:4.

On Thursday, August 18, 2022, two days after Mr. Henke submitted his affidavit, Ms. Barr called Mr. Henke to remind him of the items that Ms. Fink still needed.[134]  In a follow-up email sent that same day, Ms. Fink listed 10 action items for Mr. Henke to complete, including numerous QuickBooks-related matters, access to the Square payment system, keys and an access code to the Action Security building, emailed daily sales reports, and a completed inventory.[135]  Ms. Barr also volunteered her office's IT personnel to assist Mr. Henke with restoring his computer, which Mr. Henke said had been down since July 15, 2022.[136]

Ms. Barr asked for the items to be completed by close of business Monday, August 22, 2022.[137]  Mr. Henke missed this deadline.[138]  Consequently, Ms. Barr emailed Mr. Henke that day to remind him of the things that she needed done.[139]

On August 23, 2022, Ms. Barr spoke with Mr. Henke.[140]  During that conversation, Mr. Henke informed Ms. Barr that he had completed several of the items, including creating a backup copy of his QuickBooks, generating a payroll summary, paying his second quarter 2022 unemployment taxes, providing a login for the Square account, and cutting a key to the Action Security building and arranging for a new alarm access code.[141]  However, neither Ms. Fink nor Ms. Barr ever received any of these materials from Mr. Henke despite his representation to Ms. Barr that he would send them the following day.[142]  Reminder emails and phone

---

[134] *Id.* at 168:24-25–169:1-23.
[135] Doc. 68, Ex. 9.
[136] *Id.*; Feb. 28 Tr. at 170:1-24.
[137] Feb. 28 Tr. at 171:21-22.
[138] *Id.* at 172:20-25-173:1-16.
[139] Doc. 68, Ex. 10.
[140] Doc. 68, Ex. 11.
[141] *Id.*
[142] Feb. 28 Tr. at 175:23-179:25, 181:11-22.  A backup QuickBooks copy was apparently provided to Ms. Fink by Mr. Henke; however, the file was inaccessible.  *Id.* at 176:13-22.  In addition, Mr. Henke did ultimately provide a password for the Square account.  However, because two-factor authentication was needed to remotely log in, attempts by Ms. Fink and Ms. Barr to access the Square information required Mr. Henke to forward them a randomly generated authentication code.  After initially providing the information, Mr. Henke stopped providing Ms. Fink and Ms. Barr with the authentication code.

calls from Ms. Barr on August 25, 28, and 29, 2022, failed to produce the entirety of the requested information.[143]

Ms. Fink filed her second status report on September 23, 2022.[144]  This report presented the same negative outlook toward Defendants' ability or willingness to comply with the terms of the injunction.  According to Ms. Fink, Mr. Henke

> [showed no] willingness to cooperate with [Ms. Fink], adopt proper accounting practices, and ultimately ensure that his federal taxes are reported and paid on time. Since May, [Mr. Henke] has persistently failed to complete the often-simple assignments [Ms. Fink] gave him, usually without so much as requesting an extension.[145]

Mr. Henke's unresponsiveness and non-compliant behavior were consistent, despite reminders and requests from Ms. Fink and Ms. Barr.[146]  Without access to Mr. Henke's QuickBooks, Ms. Fink reported that she would not be able to prepare returns and did not expect his returns to be filed on time.[147]  Ms. Fink also informed the District Court that Mr. Henke's business "appear[ed] to be insolvent," based on Mr. Henke going over a month without paying his salaried employees and overdrawing "his only bank account 6 times since May [2022]."[148]  And again, Ms. Fink put the District Court and Mr. Henke on notice that she did not think the receivership was feasible and that it should not continue due to Mr. Henke's refusal to cooperate.[149]

The parties appeared on November 30, 2022, for a scheduled evidentiary hearing on Plaintiff's Motion for Sanctions to Dissolve Action Security.[150] Mr. Henke asked to postpone the hearing, claiming that he had an intestinal flu and 102-degree fever.[151]  Mr. Henke also represented to the District Court that he had hired a Colorado-based company, Financial Integrity, "to help me get all my ducks in a

---

[143] Doc. 68, Exs. 12, 13, 15.
[144] Doc. 48.
[145] Doc. 48-1.
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.* Ms. Fink could not prepare Action Security's corporate income tax returns since she had no data on the business's income.  Feb 24. Tr. at 111:2-112:5.  Nor could she prepare the employment and unemployment tax returns that came due after the first quarter of 2022. *Id.* at 108:2–111:16.
[150] Doc. 55.
[151] November 30, 2022 Hearing Transcript 2:21–3:17 (hereinafter "Nov. 30 Tr.")

row"[152] and that he planned to bring on an accountant for the same reason.[153] The District Court granted Mr. Henke a one-time continuance but cautioned, "'I'm not feeling well,' isn't going to work another time."[154] The Court also again admonished Mr. Henke to start communicating with Ms. Fink "a lot."[155] Mr. Henke agreed to do so.[156]

Mr. Henke did not follow through on his representation to the District Court. A series of emails from Ms. Barr to Mr. Henke between December 7, 2022, and January 17, 2023, went unanswered.[157] Ms. Barr left phone messages with Mr. Henke on December 14, 2022, and January 17, 2023, that went unreturned.[158] She left a last phone message with Mr. Henke's mother in mid-February 2023 requesting the authentication code for the Square login so that she could "update the financial information."[159] Mr. Henke did not return that message.[160]

Ms. Fink filed her third status report on March 23, 2022. In that report, Ms. Fink repeated what she had previously told the District Court about Mr. Henke's failure to work with her. Specifically, Ms. Fink stated that Mr. Henke continued to withhold information, reform his business, follow directions, or otherwise work with Ms. Fink or Ms. Barr.[161] Ms. Fink stated that her office had had no out-of-court correspondence with Mr. Henke since August 2022.[162] Because of Mr. Henke's refusal to work with her or Ms. Barr, Ms. Fink gave her notice of resignation from the receivership, effective April 21, 2023.[163]

### III.    APPLICABLE LAW

Internal Revenue Code § 7402 grants district court's jurisdiction "to make

---

[152] Id. at 5:8–17.
[153] Id. at 5:16–17.
[154] Id. at 9:14–15.
[155] Id. at 8:25–9:19.
[156] Id. at 9:20–21.
[157] Doc. 68, Exs. 17-20; see generally Feb. 28 Tr. at 190-198.
[158] Doc. 68, Ex. 20; Feb. 28 Tr. at 197:7-13.
[159] Feb. 28 Tr. at 205:5-10.
[160] Id. at 205:12-13.
[161] Doc. 73.
[162] Doc. 73-1.
[163] Id.

Report and Recommendation                                          19
United States of America v. Action Security, et al.
Case 3:19-cv-00134-JMK-KFR    Document 91    Filed 01/10/24    Page 19 of 50

and issue in civil actions, writs and orders of injunction, and of ne exeat republica, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."[164]  Section 7402(a) "was intended to provide the district courts with a full range of powerful tools to ensure the enforcement of both the spirit and the letter of the internal revenue laws."[165]  The statute "has been construed broadly, to allow courts the full panoply of remedies necessary to effectuate the enforcement of federal tax laws."[166]

The Ninth Circuit has held that "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief."[167]  Because § 7402(a) grants the court injunctive power, it is likely that the government need only show that an injunction is appropriate for the enforcement of the internal revenue laws, without reference to the traditional equitable factors.[168]  Courts that have taken this approach have held that injunctive relief is appropriate if the defendant is reasonably likely to violate the federal tax laws again.[169]  In similar contexts, the Ninth Circuit has instructed courts "predicting the likelihood of future violations[] to assess the totality of the circumstances surrounding the defendant and his violations."[170]

Because neither the Supreme Court nor the Ninth Circuit Court of Appeals has provided express guidance regarding the standard applied to requests

---

[164] 26 U.S.C. § 7402(a).

[165] *United States v. Raymond*, 78 F. Supp. 2d 856, 877 (E.D. Wis. 1999).

[166] *United States v. Bartle*, No. IP01–0768, 2002 WL 75437, at *4 (S.D. Ind. Jan. 16, 2002).

[167] *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983).

[168] *United States v. Stoll*, No. Civ. C05–0262, 2005 WL 1763617, at *8 (W.D. Wash. June 27, 2005) (*citing In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (holding, in a bankruptcy case, that where a statute, such as IRC § 7402(a), grants the court injunctive power, the court is not "confined to traditional equity jurisprudence")).

[169] *See United States v. Harkins*, 355 F. Supp. 2d 1175, 1180 (D. Or. 2004) (*citing United States v. Kaun*, 827 F.2d 1144, 1150 (7th Cir. 1987)).

[170] *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *see also La Quinta Worldwide, LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014) ("It is important to consider the totality of circumstances bearing on whether a permanent injunction is appropriate equitable relief.").

for injunctive relief pursuant to § 7402(a), however, other courts have analyzed such requests under the equitable factors traditionally applied to a request for a permanent injunction.[171] These factors are: (1) the likelihood of substantial and immediate irreparable injury; (2) the inadequacy of remedies at law; (3) actual success on the merits of a claim; (4) the balance of hardships between the plaintiff and defendant; and (5) the public interest.[172] When the government is a party, the balance of hardships and public interest factors merge.[173]

Out of an abundance of caution, the Court evaluates the appropriateness of a permanent injunction under both standards.

## IV. ANALYSIS

### a. The Court Finds the Government's Evidence and Witnesses to Be Credible and Does Not Find Mr. Henke to Be a Credible Witness.

In making its findings, the Court has considered the evidence in the record, including the sworn declarations filed in conjunction with this motion and others, as well as the sworn testimony and exhibits submitted during the evidentiary hearing. The Court finds the government's witnesses' statements and declarations, given under penalty of perjury and supported by admissible evidence, to be credible.

The Court does not find Mr. Henke to be credible and has discounted his evidence and testimony accordingly. Mr. Henke failed to abide by the clear mandates of the Stipulated Injunction despite his agreement to do so. He failed to heed the District Court's warnings as to what might happen were he not to work with the Receiver despite his claim that he understood the Court's admonition. And most

---

[171] *See, e.g., United States v. China China Inc.,* No. C 11–2065 SC, 2011 WL 4404941, at *4–7 (N.D. Cal. Aug. 31, 2011) (noting lack of clarity regarding proper standard and analyzing motion for default judgment seeking injunctive relief under the standard set forth in 26 U.S.C. § 7402(a) and under traditional equitable principles), *adopted by,* 2011 WL 4404154 (N.D.Cal. Sept. 21, 2011). U.S. v. Merritt, 2011 WL 5026074, at *6 (E.D.Cal., 2011).

[172] *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006); *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

[173] *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

importantly, throughout the course of this litigation he has made statements – both unsworn and sworn – to the District Court, this Court, the IRS, and others that are simply inconsistent with the facts.

For instance, at the Court's November 30, 2022 Status Conference, Mr. Henke informed the Court that he had met with Ms. Barr and that he had "made all of the payments" and "done everything [he] possibly could."[174] However, for the first quarter of 2022, Mr. Henke paid only $343.74 of the required $4,757.18 owed in employment taxes.[175] Moreover, at that point in time, Mr. Henke had not provided passwords to Ms. Fink to permit her to access his accounts or to use those accounts to pay taxes owed, had not prepared an inventory, had not responded to Ms. Fink or Ms. Barr's requests for pertinent financial information, and had avoided meeting and communicating with Ms. Fink and Ms. Barr.[176] Each of these actions was required under the Stipulated Injunction and Appointment Order.

Mr. Henke's false statements about his cooperation with Ms. Fink and Ms. Barr continued at the evidentiary hearing. Mr. Henke testified under oath that he had timely provided Ms. Fink and Ms. Barr everything they had requested except for the "alarm code and a key to the front door."[177] As explained above, this statement is false.[178]

---

[174] Nov. 30 Tr. at 4:7-8.
[175] Doc. 40-1. This payment would have been due April 30, 2022, only six months prior to the Court's Status Conference.
[176] See, e.g., Feb 28 Tr. at 178:20-179:1 (Testimony from Ms. Barr that Mr. Henke never provided Ms. Fink with a key or building alarm code for the Action Security location); see also id. at 116:17-22 (Testimony from Ms. Fink that she did not have keys or alarm access); id. at 105:24-25 (testimony from Ms. Fink that "[t]o this day, there is still no inventory[.]"); id. at 108:13-109:1, 116:17-22, 187:7-188:16 (Testimony from Ms. Fink and Ms. Barr detailing how Mr. Henke stopped providing Ms. Fink with the dual-factor authentication code login needed to access Square account); see also Status Reports at Docs 39-1, 48-1, and 73-1; Doc. 68, Exs. 17-20 (emails from Ms. Barr to Mr. Henke attempting to obtain information); Doc. 48-1 (status report by Ms. Fink describing difficulties communicating with Mr. Henke and failures by Mr. Henke to provide QuickBooks account access, copies of incoming and outgoing mail, daily accounting of Action Security's revenue and expenditures, or a business inventory).
[177] Feb. 28 Tr. at 23:7-8.
[178] See supra notes 114, 133-142.

Mr. Henke claimed that one of the reasons for his failure to provide information to Ms. Fink and Ms. Barr as required under the receivership order was because, despite being "available seven days a week," Ms. Fink and Ms. Barr had "not reached out to [him] at all saying anything that they need[ed] from [him]."[179] However, this claim by Mr. Henke attempting to place blame on Ms. Fink and Ms. Barr for not communicating with him is not supported by the record. The credible testimony from Ms. Fink and Ms. Barr, supported by multiple government exhibits, was that they attempted to contact Mr. Henke through both phone and email (and were occasionally successful) and requested specific items from him on multiple occasions.[180]

In addition to the government's evidence, Mr. Henke's own testimony and exhibits undermine his claim about being available and not being told what was needed. In one text message with Ms. Fink following his June 9, 2022 meeting, Mr. Henke wrote that "his homework is done," a clear indication to this Court that he had in fact been given a list of tasks to be completed.[181] Contemporaneous statements recorded by Ms. Barr and contained in emails sent to Mr. Henke show that Mr. Henke was provided with lists of tasks to complete and acknowledged those tasks.[182] When asked about communications with Ms. Barr, Mr. Henke admitted that she had "reached out to [him]" and that "[s]he's emailed [him]."[183]

The facts similarly do not support Mr. Henke's testimony concerning his entry into the Stipulated Injunction. Mr. Henke testified that he signed the injunction under some duress after being "very intimidated" by an IRS agent who showed up at his door unannounced and said, "sign this."[184] He also testified that he did not have

---

[179] *Id.* at 30:19-20.
[180] *See supra* note 176.
[181] Doc. 68, Ex. D.
[182] *See id.*, Ex. 9 ("Scott, these are the items we discussed earlier this morning in our phone conversation...").
[183] Feb. 28 Tr. at 22:16-25.
[184] Mar. 1 Tr. at 80:1-3.

a "clue what [the stipulation] was."[185]   This testimony is undermined by the considerable back-and-forth between Mr. Henke and the IRS regarding the proposed stipulation and Mr. Henke's own email containing his signature on the stipulation.

The IRS sent Mr. Henke a letter and proposed stipulation on September 3, 2019.  Mr. Henke wrote back that he was "interested in resolving this issue and signing the injunction with a few changes."[186]  He then went on to detail several specific changes to the proposed injunction that he wanted to see, including the dates on which payments were to be made, changes to the time period for inspection of books, and the lifting of liens that had been placed on Action Security.[187]  The IRS agreed to some changes and sent a modified proposed injunction back to Mr. Henke on September 10, 2019.[188] On September 12, 2019, Mr. Henke replied with additional proposed changes, referencing specific line items he was seeking to renegotiate.[189] The IRS again agreed to some of Mr. Henke's proposed changes and sent him a third draft of the proposed injunction that same day.[190]  When the IRS had not heard back from Mr. Henke by September 16, it emailed again asking for an update.  Mr. Henke replied several hours later saying that he had been working in a location in Alaska without cell service and that he would try to review the proposed injunction "later today" or "tomorrow."[191]  He then signed the proposed stipulation and sent via email a photo of his signature on September 19, 2019.[192]

The record makes clear that Mr. Henke was clearly well-informed about the contents of the proposed injunction he signed, and that nothing about his contacts with the IRS could be considered intimidating.  Mr. Henke had versions of each draft of the proposed injunction for several days.  He appears to have used that time to

---

[185] *Id.* at 80:9-10.
[186] Doc. 16-1 at 7.
[187] *Id.*
[188] *Id.* at 6.
[189] *Id.* at 5.
[190] *Id.* at 4-5.
[191] *Id.* at 4.
[192] Doc. 68, Ex. 22 at 1.

review the proposed injunction because he made multiple requests for specific changes to the document. He then sent an email containing a photograph of his signature on the stipulation's signature page. It is not credible for Mr. Henke to testify under oath that he didn't have a "clue" what was in the stipulation or that he was somehow forced into signing it.

Mr. Henke has also hedged and been inconsistent about other aspects of his case, further undermining his credibility. To convey the financial straits he found himself in following his divorce, Mr. Henke repeatedly highlighted the measures he took to downsize his business and the short time frame he had to accomplish those actions. However, on each occasion, the size of his inventory, the amount of time to accomplish the move, and the space into which he moved all materially varied.[193]

Mr. Henke also failed to provide consistent information about his purported retention of various professionals to assist him in this matter. Of greatest concern was Mr. Henke's statement to the District Court in November 2022 that he had in fact retained a financial services firm to assist him.[194] Mr. Henke subsequently told Ms. Barr[195] and testified before this Court[196] that he had hired or was in the process

---

[193] *Compare* Mar. 1 Tr. at 6:5-6 ("I moved 30,000 feet into 2,300 feet") *with* Feb. 1. Tr. at 36:16-20 ("I put 50,000 feet in 2,800 feet of locations" and "I'm sitting in a 2,200 square-foot place with 30,000 feet of inventory") *with* Feb. 1 Tr. at 164:3-5 ("Did I also tell you, I had to move my company, in less than 20 days, from 18,000 feet into 2,300 feet" *with* Doc. 43 at 1 ("Action moved 30000 square feet of inventory, vehicle, equipment and furniture into 2700 square feet in less than 10 days.").

[194] Nov 30 Tr. at 5:10-6:11 (statement by Mr. Henke to the District Court that he had "hired [Financial Integrity] to try and get [him] back in line" and further description of communications with three possible lawyers).

[195] Feb 28 Tr. at 190:19-24 ("Scott, per Judge Holland's instructions, we met in court on Wednesday, November 30, 2022. He requested that you communicate with Lisa. He also asked that you provide her with the contact's name at the financial firm you stated you hired. It has been eight days, and we are notifying you that you have not complied with the judge's orders."); *id.* at 197:15-22 ("Scott, I just left a voicemail message for you at 3:14 p.m. on your cell, 907-227-2911. I've sent you two emails, December 7th and 14th, and left a voicemail message for you on December 14th, and I have not heard back from you. Judge Holland instructed you to communicate with Lisa and provide her with a contact name at the financial firm you hired. Neither Lisa nor I have heard from you or your new financial firm.").

[196] *See* Mar. 1 Tr. at 73-98 (Discussion of different individual attorneys, financial firms, IRS agents, and payments); *id.* at 22:4-22. ("I'm in the process of hiring a company called Focus Financial, which is a local company that writes checks that will handle all my 941s, all my payroll, all my taxes, and complete everything that is taking time away from me servicing

Report and Recommendation                                          25
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR    Document 91    Filed 01/10/24    Page 25 of 50

of hiring professional assistance to help him resolve his tax problems. However, the record does not contain any evidence of the hiring of any financial services firms until May 16, 2023.[197] Yet even when Mr. Henke provided this evidence, he simultaneously represented to the Court that he was still seeking to "obtain a company to assist [him] in resolving [his] debts."[198] Mr. Henke's statements regarding his attempts to retain legal counsel were similarly contradictory and unsupported by documentary evidence.[199]

In addition, while attempting to explain his failure to communicate with Ms. Fink and Ms. Barr following the November 30, 2022 Status Conference, Mr. Henke provided multiple shifting justifications, none of which satisfactorily explained his failure to comply with the District Court's direct admonition to him that he start communicating with Ms. Fink "a lot."[200] As it related to email communications, Mr. Henke first claimed that he did not receive emails sent by Ms. Barr because they were sent to the email "shenke@actionsecurity," an email account he was "not

[197] Mr. Henke provided a letter dated May 16, 2023, stating that "Integrity Financial Associates ("IFA") has been contracted by Action Security, Inc. to help resolve their federal tax issues." Doc. 88-1.

[198] Doc. 88 at 1.

[199] Mr. Henke repeatedly asserted that he had hired or was attempting to hire an attorney to help him resolve his tax problems. None of those attempts bore fruit, though, and the record does not contain any documentary evidence to support Mr. Henke's statements that he had spent over $10,000 attempting to hire various attorneys. *See* Doc. 16-1 at 7 (2019 email from Mr. Henke to the IRS stating that he had "spoken with a number of attorneys and [hadn't decided if he could] afford to proceed forward with their help"); Feb. 28 Tr. at 7:20-8:8 ("Your Honor, I tried to obtain representation for two months. I hired a company, paid $5,000 to them, and less than two weeks ago, they told me they couldn't represent me because the case was in court. I then proceeded to find another attorney that I gave money -- $5,000 to as well, and he told me that he couldn't represent me because of where it was at in the court session. I went to the Anchorage Bar Association, the Alaska Bar Association, everywhere, trying to find someone to represent me, and I think that you're aware that there's a shortage of attorneys. All of the attorneys that were practicing this type of stuff have quit or are not back practicing at this point in time or overloaded with cases. So I am by myself at this point in time.").

[200] Nov. 30 Tr. at 8:25–9:19.

of hiring professional assistance to help him resolve his tax problems. However, the record does not contain any evidence of the hiring of any financial services firms until May 16, 2023.[197] Yet even when Mr. Henke provided this evidence, he simultaneously represented to the Court that he was still seeking to "obtain a company to assist [him] in resolving [his] debts."[198] Mr. Henke's statements regarding his attempts to retain legal counsel were similarly contradictory and unsupported by documentary evidence.[199]

In addition, while attempting to explain his failure to communicate with Ms. Fink and Ms. Barr following the November 30, 2022 Status Conference, Mr. Henke provided multiple shifting justifications, none of which satisfactorily explained his failure to comply with the District Court's direct admonition to him that he start communicating with Ms. Fink "a lot."[200] As it related to email communications, Mr. Henke first claimed that he did not receive emails sent by Ms. Barr because they were sent to the email "shenke@actionsecurity," an email account he was "not

our customers. I've got a company called Phoenix that is wanting to do a retroactive filing for a program called ERC, which is employment retention credit, to where credits are given for our entire 2020 and 2021 payroll. And this is a program that's being given out by the United States of America, and they are willing to work with me on that. I have communicated to a number of companies that said that the receivership is not your friend. These are professional companies that do these jobs. They have looked at the documentation and was trying to see if they could contact the IRS to take it over. And due to the fact that it's in court, they were not able to do it, but they were very willing and said that they could handle this and gets my books in line and get back in line with the IRS.").

[197] Mr. Henke provided a letter dated May 16, 2023, stating that "Integrity Financial Associates ("IFA") has been contracted by Action Security, Inc. to help resolve their federal tax issues." Doc. 88-1.

[198] Doc. 88 at 1.

[199] Mr. Henke repeatedly asserted that he had hired or was attempting to hire an attorney to help him resolve his tax problems. None of those attempts bore fruit, though, and the record does not contain any documentary evidence to support Mr. Henke's statements that he had spent over $10,000 attempting to hire various attorneys. *See* Doc. 16-1 at 7 (2019 email from Mr. Henke to the IRS stating that he had "spoken with a number of attorneys and [hadn't decided if he could] afford to proceed forward with their help"); Feb. 28 Tr. at 7:20-8:8 ("Your Honor, I tried to obtain representation for two months. I hired a company, paid $5,000 to them, and less than two weeks ago, they told me they couldn't represent me because the case was in court. I then proceeded to find another attorney that I gave money -- $5,000 to as well, and he told me that he couldn't represent me because of where it was at in the court session. I went to the Anchorage Bar Association, the Alaska Bar Association, everywhere, trying to find someone to represent me, and I think that you're aware that there's a shortage of attorneys. All of the attorneys that were practicing this type of stuff have quit or are not back practicing at this point in time or overloaded with cases. So I am by myself at this point in time.").

[200] Nov. 30 Tr. at 8:25–9:19.

checking at [the] time."[201]  When informed by the Court that some of the emails were sent to the account that he testified he was regularly using, "dispatch@actionsecurity," Mr. Henke pivoted and said that he was out of the office during that time, bedridden with COVID.[202]  Mr. Henke then admitted that he "obviously" had spoken to Ms. Barr about the contents of those emails, thereby admitting that he had received and reviewed them, but added that "if" they had spoken, he was not "100 percent coherent at the time" because he was "under the weather."[203]  He then added that his failure to respond and cooperate was the result of legal advice he had been given.[204]

Mr. Henke told a similar story when it came to attempts by Ms. Barr to speak to him.  Mr. Henke said that he had not received any of the calls Ms. Barr had left following the November 30 Status Conference, but then conceded that Ms. Barr had "left messages."[205]  Mr. Henke did not have an answer for why he failed to respond to those calls.[206]

This record leaves the Court with a firm conviction that Mr. Henke's testimony regarding his actions in this matter is simply not credible.  Mr. Henke has failed to abide by his promises and representations to the District Court, has repeated false statements about his interaction with the Receiver, and has been inconsistent as to other material matters in this case.  Accordingly, the Court places little to no weight in the testimony of Mr. Henke at the evidentiary hearing or in the supporting documentation provided by him during this litigation.

---

[201] Mar. 1 Tr. at 47:18-20.
[202] *Id.* at 69:3-9, 69:17-22.  The Court notes that Mr. Henke communicated with the IRS in 2019 about the stipulated injunction using his shenke@actionsecurity email account. However, when asked about why he did not respond to Ms. Barr's emails in August and November 2022, Mr. Henke testified that he did not recall seeing any of them because it was sent to the "shenke" account, which he does not regularly check "due to the fact that [he's] never at his desk anymore."  *Id.* at 67:19-24.  Mr. Henke testified that the account he primarily used in 2022 was dispatch@actionsecurity, and that it was the one he was "most likely to receive emails at."  *Id.* at 68:12-14.
[203] *Id.* at 69:17-22.
[204] *Id.* at 47:23-48:2.
[205] *Id.* at 48:7-16.
[206] *Id.* at 48:21-22.

Report and Recommendation                    27
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 27 of 50

### b. Plaintiff Has Met the Standard for Granting a Permanent Injunction.

Plaintiff has provided sufficient evidence showing that a permanent injunction is warranted. Plaintiff has shown that a permanent injunction is appropriate for the enforcement of the internal revenue laws, and that a permanent injunction is warranted based on the traditional equitable factors.

In determining the appropriateness of a permanent injunction for the enforcement of the internal revenue laws, the Court considers the totality of the circumstances, including the following factors: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation, and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transaction; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations.[207] As detailed herein, the Court finds that each of these factors weighs strongly in Plaintiff's favor.

### i. The Gravity of the Harm Caused by Defendants' Violation of the District Court's Order Is Significant.

The first factor the Court considered is the harm caused by Defendants' conduct. Defendants have failed to pay nearly all their unemployment, employment, and corporate taxes since 2014.[208] As a result, according to the IRS, Action Security owes $1,896,140.97 to the United States in unpaid taxes.[209] Defendants' continued refusal to comply with the Court's orders has caused that figure to balloon to $4,467,738.53 when accounting for penalties and interests,[210] and that debt appears to be growing unabated.

---

[207] *Harkins*, 355 F. Supp. 2d at 1181 (*citing United States v. Raymond*, 228 F.3d 804, 813 (7th Cir. 2000)); *Murphy*, 626 F.2d at 655.
[208] Doc. 87 at 9.
[209] Doc. 68, Ex. 5.
[210] Doc. 45 at 2-3.

The Court notes that Mr. Henke confidently maintained during the evidentiary hearing that he could pay off his debt and rebound his company. Mr. Henke testified that "customers are coming back"[211] and that he can "pretty much" earn whatever it takes to square his debts.[212] However, Mr. Henke admitted that he had no strategy to pay off what he owed, much less the additional taxes that may have accrued since the commencement of this proceeding.[213]

Moreover, Mr. Henke's confidence flies in the face of the record in this case. Defendants have consistently failed to pay their required employment, unemployment, and income taxes since 2014. This failure to pay accruing taxes or to attempt to make good on amounts past due exists even though Mr. Henke claimed that business was increasing following the COVID-19 pandemic with the return of customers, a portfolio of statewide clients, large corporate clients who he claims generate revenues of "40 to 50 thousand dollars" per year, and new "lucrative" revenue streams creating "automotive keys to the tune of $300 to make a key."[214] However, according to Ms. Fink, in actuality Action Security was "insolvent...because it's not making enough money to support anybody."[215]

Mr. Henke's only evidence of future financial solvency and ability to pay his taxes was a spreadsheet showing that credit card receipts from January 1, 2023, to February 28, 2023, were 33.5% higher in 2023 than in 2022.[216] That may be so. However, as Plaintiff pointed out, it fails to prove the business grew more profitable in 2023 and does not account for inflation nor does it prove that total revenue increased. Further, the data compares only the first two months of 2023 to the entire

---

[211] Mar. 1 Tr. at 28:24, 25:21-22.
[212] *Id.* at 27:1-7; *see also id.* at 56:7-9 ("And I'm telling you I'm on target, and I told you that when we first spoke, is that I am bound and determined to pay back everything I owe.").
[213] *Id.* at 45:1–4.
[214] *Id.* at 62:2-63:6.
[215] Feb. 28 Tr. at 122:10-12. During the time that Ms. Fink has access to Action Security's finances, she observed that it made a profit of $23,000, but that Mr. Henke had personal expenses of $26,000, putting him in a $3,000 hole. *Id.* at 122:4-7. As a result, Mr. Henke had multiple overdrawn checks from his Wells Fargo account. *Id.* at 106:14-17.
[216] Doc. 68, Ex. G.

previous year. This brief snapshot of revenue into one account is of limited value to the Court and is overcome by the bleak financial picture for Action Security painted by the evidence in this case. The first factor, therefore, weighs in Plaintiff's favor.

### ii. The Defendant Is Aware of His Obligations Under the Law and Has Willfully Violated the Court's Order.

The second factor the Court considers is the extent of Defendants' participation and their degree of scienter. Mr. Henke is the sole owner and operator of Action Security, and thus any failure to file or pay taxes for nine years is a direct result of his inaction. The Court finds Mr. Henke was intimately aware of his violations and understood he was conducting his business in violation of IRS tax laws and warnings.

As detailed above, the IRS has attempted since 2016 to bring Defendants into tax compliance via myriad efforts. Mr. Henke agreed to the Stipulated Injunction directing his compliance in 2019. The District Court found Mr. Henke in contempt in 2021 and appointed a receiver to bring him into compliance. In November 2022, the District Court admonished Mr. Henke to work with the Receiver. And at the evidentiary hearing, Mr. Henke admitted to not paying his taxes or complying with the Stipulated Injunction because he prioritized paying creditors first.[217] The second factor thus weighs in favor of Plaintiff.

### iii. Defendants Are Likely to Continue to Break the Law and Violate the District Court's Order.

The third factor involves the frequency of the infraction, i.e., whether it was isolated or is recurrent in nature, and the likelihood that Defendants will continue to violate the tax laws and the Stipulated Injunction. The frequency of the Defendants' failure to file or pay taxes has persisted for nine years, making it highly recurrent in nature. Given the prolonged, consistent duration of tax avoidance, and Mr. Henke's willingness to continue to avoid paying taxes during the pendency of

---

[217] Feb. 28 Tr. at 19:2-7; see also Mar. 1 Tr. at 55:16-56:6.

this action, it appears inevitable that Defendants will fail to meet their tax obligations if allowed to continue as currently structured, or if Mr. Henke is allowed to assume a role in another organization with responsibility for tax compliance.

Since the outset of this case, Mr. Henke has steadfastly refused to take any significant action that would demonstrate to the Court that he has a genuine desire to bring Action Security into tax compliance. For example, starting in 2016, the IRS attempted to advise him on how to follow the tax code. To this end, RO Johnson communicated with Mr. Henke in person, through letters, and telephonically about what Defendants needed to do to comply with the relevant tax laws.[218] Mr. Henke did not comply with RO Johnson's instructions.[219]

Mr. Henke's failure to work with RO Johnson ultimately led to referral of his case for civil injunction.[220] As detailed above, Mr. Henke failed to follow through on his obligations under the Stipulated Injunction. That failure led to the appointment of a receiver, Ms. Fink, and an order to cooperate. Mr. Henke failed to comply with that order.

Despite his repeated statements that he wished to resolve this matter, Mr. Henke appeared unable to take basic steps to bring Action Security's affairs in order. Mr. Henke disregarded essentially all of Ms. Fink's assignments: He did not give her a summary of his inventory,[221] a daily sales report,[222] remote access to QuickBooks,[223] consistent access to his Square account,[224] keys to his shop,[225] or a list of his invoices and debts.[226] As of the date of the final Status Report from Ms. Fink, he still had not accomplished any of these tasks.[227] Mr. Henke's actions, or lack

---

[218] Feb. 28 Tr. at 43:6-15.
[219] *Id.* at 43:16-20.
[220] *Id.* at 43:21-24.
[221] *Id.* at 116:11–15.
[222] *Id.* at 179:11-17.
[223] *Id.* at 109:5–18.
[224] *Id.* at 108:12-109:1, 116:18, 120:2-8.
[225] *Id.* at 116:17.
[226] *Id.* at 116:23–117:6.
[227] Doc. 73-1; *see also supra* notes 174-176 and accompanying text. Mr. Henke provided brief access to his Square account but failed to respond to requests from Ms. Fink or Ms. Barr for additional information needed to maintain that access.

thereof, confirm Ms. Fink's conclusion that Mr. Henke was "horrible"[228] at communicating and that the receivership was impossible.[229]

Even when Ms. Fink was able to accomplish anything of substance on Mr. Henke's behalf, Mr. Henke failed to follow through with his legal obligations. During his initial period of cooperation with Ms. Fink, Mr. Henke gave her access to his QuickBooks, allowing Ms. Fink to prepare Defendants' Forms 940 and 941 through the first quarter of 2020. Despite this, Mr. Henke paid less than 10% of the first quarter employment taxes due on March 1, 2022.[230]

Even the District Court's admonishment at the November 30 Status Conference that it "expect[ed] there to be a lot of communication Mr. Henke, between you and Ms. Fink" failed to spur Mr. Henke into action.[231] The District Court plainly told Mr. Henke:

> THE COURT: You have got to inform her as to what you're doing. You have got to put her in touch with the people that you say you're working with, because at this point, quite frankly, I'm suspicious as to whether you really have a viable operation going. You're talking about getting investors, and, sir, I'm afraid that's a pipe dream, but if it's real, you have got to be communicating what's going on to the receiver.
>
> MR. HENKE: Okay.

Tellingly, neither Ms. Fink nor Ms. Barr have had any out-of-court contact with Mr. Henke since the District Court's advisement despite repeated emails and phone messages.[232]

Indeed, it appears as if some of the steps taken – or not taken – by Mr. Henke were taken with the express purpose of frustrating the work of the Receiver. Immediately after her appointment, Ms. Fink was able to meet with Mr. Henke and gain access to his Wells Fargo account, the account from which he told her that he paid his rent and wages. But prior to gaining that access, and shortly after Ms. Fink's

---

[228] Feb. 28 Tr. at 113:25.
[229] Doc. 48-1.
[230] Doc. 39-1 at 1.
[231] Nov. 30 Tr. at 8:25-9:2.
[232] Doc. 68, Exs.17-20; *see also* Feb. 28 Tr. at 116:6-10.

Report and Recommendation
*United States of America v. Action Security, et al.*
32
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 32 of 50

appointment, Mr. Henke withdrew a significant amount of money from the account and failed to provide Ms. Fink with documentation supporting Mr. Henke's insistence that the withdrawals were to pay vendors.[233]    To date, no such documentation has been provided.[234]

Mr. Henke then kept the balance in the Wells Fargo account low to protect it from "people coming in and taking money out of [the] account,"[235] and appeared to shift most financial activity to the Square account, from which Mr. Henke could deny access to Ms. Fink by failing to provide her with the two-factor authentication code needed to remotely access that account.[236]    The result of Mr. Henke's actions following the appointment of the Receiver was to drain and then starve the Wells Fargo account, the only account from which Ms. Fink could pay taxes owed by Mr. Henke and Action Security, thereby denying her the ability to perform a key component of her role as Receiver.

Mr. Henke also denied Ms. Fink access to his business.  Curiously, Mr. Henke, a locksmith by trade, was never able to provide Ms. Fink with a key to his property, and claimed that he could not provide Ms. Fink with the alarm code for his security system because he had "not been able to figure out how to change the alarm code."[237] And Mr. Henke's repeated assertions that he was available any time to meet with Ms. Fink or Ms. Barr are undermined by the frequency with which he cancelled

---

[233] Feb. 28 Tr. at 106:13-107:5; *see also id.* at 157:13-21 (Testimony by Ms. Fink that this withdrawal suggested that Mr. Henke was "taking money out of the account real quick before a receiver comes in.").

[234] Mar. 1 Tr. at 8:2-6; *see also* Doc. 68. Exs. B, C.  At the evidentiary hearing, Mr. Henke produced records showing a similar $7,000 withdrawal two months after Ms. Fink's appointment, and testified that this withdrawal was made in order to pay a vendor.  Mr. Henke's credibility on this issue is undermined by his ability to selectively produce documentation only for those issues that appear to inure in his favor, while withholding production for those that might undermine it.  *See supra* notes 194-199 and accompanying text.  Moreover, even if the questioned withdrawals were for the purchase of inventory, they would violate the injunction, which prohibited Mr. Henke from paying any commercial bills prior to his federal taxes.  Doc. 38.

[235] Mar. 1 Tr. at 54:9-12.

[236] *See, e.g.*, Feb. 28 Tr. at 108:12-109:1, 116:17-22, 187:7-188:16 (Testimony from Ms. Fink and Ms. Barr detailing how Mr. Henke stopped providing Ms. Fink with the dual-factor authentication code login needed to access Square account).

[237] *Id.* at 23:8-9.

meetings, missed phone calls claiming he was unavailable due to working in remote parts of the state, or simply did not respond to email and voice message requests to communicate.

Mr. Henke repeatedly claimed at the evidentiary hearing that he was working tirelessly to keep his business afloat.[238]  In Mr. Henke's view, it was more important to him to do business than it was to comply with the injunction.  However, nothing precluded Mr. Henke from doing both, and indeed, much of what Ms. Fink and Ms. Barr completed on Mr. Henke's behalf and were prepared to undertake going forward – the filing of required paperwork, the implementation of accounting and inventory systems – would have freed Mr. Henke to run his business more efficiently. In the Court's view, the steps Mr. Henke took to frustrate Ms. Fink were the result of his unwillingness, rather than an inability, to get her what she needed.

The only step that Mr. Henke appears to have taken to address his tax compliance issues was to hire at the 11th hour a financial firm.  However, the Court is not swayed by this effort.  Mr. Henke told the IRS and District Court multiple times during this litigation that he either did, or intended to, hire an outside firm to assist him with his tax issues.[239]  However, it is only when faced with the imminent possibility of closure that it appears he might actually have.[240]  In addition, Mr. Henke has consistently failed to follow the tax laws and the District Court's orders, even when given multiple opportunities to work with Plaintiff and the resources of a qualified receiver.  This abysmal track record gives the Court no confidence that Mr. Henke intends to follow through with his retained financial services firm in such a way that will result in his compliance with the tax laws and will allow him to address his debt to the United States.

Mr. Henke testified at the evidentiary hearing on this motion that he "was trying to comply [with the injunction] and move on with [his] life so he can get [his

---

[238] *Id.* at 35:1-5; Mar. 1. Tr. at 6:17, 7:6, 29:2, 49:8-14, 56:1-6.
[239] Mar. 1 Tr. at 22:1-14; Nov. 30 Tr. at 5:10-25, 6:1-11.
[240] Doc. 88-1.

Report and Recommendation
*United States of America v. Action Security, et al.*
34
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 34 of 50

tax problems] eliminated."[241]  However, his actions belie that testimony.  Since the outset of this matter and continuing to this day, Mr. Henke has acted in ways that demonstrate to this Court that Defendants' primary objective is avoidance of their tax problems, as opposed to their elimination.  The Court finds that the third factor weighs heavily in Plaintiff's favor.

### iv.  Mr. Henke Has Not Acknowledged His Own Culpability.

The fourth factor is Defendant's recognition of his own culpability.  While Mr. Henke has expressed in words his willingness to pay his debts and bring his company into tax compliance, his actions belie that intent.  The Court has before it little to no evidence of him accepting responsibility for his actions.   Rather, Mr. Henke's statements relating to his failure to pay taxes owed are surrounded by excuses, and he has consistently blamed others – RO Johnson, Ms. Fink, Ms. Barr – for his inability to comply with the law and the orders of the District Court.

The most telling demonstration of Mr. Henke's lack of recognition of his own culpability has been his response to Ms. Fink's appointment.  At the evidentiary hearing, Mr. Henke faulted the District Court for giving "Ms. Fink the receivership without [his] knowledge,"[242] despite having been served with a copy of the motion and the District Court's order appointing Ms. Fink.[243]  He went on to then assert that despite its obvious impact on his business, and the potential sanctions that could result were he not comply with the District Court's order, he had not read the Appointment Order[244]

It would seem apparent that anyone facing a significant tax liability would welcome the opportunity to work with a court-appointed receiver to help resolve the matter.  The Court will not speculate why Mr. Henke has spurned this opportunity;

---

[241] Feb. 28 Tr. at 33:14-15.
[242] Id. at 6:19-20.
[243] Docs. 29, 30.
[244] Mar. 1 Tr. at 31:14.  According to Mr. Henke's testimony at the evidentiary hearing, he did not read the Appointment Order when it was served on him and still "still [hadn't] read it to this day. Okay?"  Id. at 15.  Mr. Henke made this assertion despite Ms. Fink's testimony that she reviewed the receivership order with him "line by line."  Feb. 28 Tr. at 98:3-4.

Report and Confirmation
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR    Document 91    Filed 01/10/24    Page 35 of 50

35

however, his hostility toward Ms. Fink, her assistant Ms. Barr, and their collective assistance has been jarring and continues Mr. Henke's trend of seeking to address his tax problems by attempting to ignore them or blaming others. Mr. Henke claims his hostility toward Ms. Fink was based on her purported faults and inexperience.[245] However, it is apparent from Ms. Fink's resume and experience that she was more than capable of assisting Mr. Henke in this case.

At the evidentiary hearing, Mr. Henke sought to cast blame on Ms. Fink, criticizing her for not guiding him sufficiently through the process[246] or sending reminders of things he needed to accomplish.[247] Only on cross-examination did Mr. Henke concede that Ms. Fink did give him a "list of assignments," that he had reviewed that list, and that reminders about these actions items were sent to him on multiple occasions.[248] Indeed, the record shows that between their initial meeting on May 10, 2022, and the evidentiary hearing in early 2023, Ms. Fink or Ms. Barr met with Mr. Henke or communicated with him through phone, text, or email no fewer than 15 times.[249] Among these communications were emails that included a list of 10 specific action items Mr. Henke needed to accomplish.[250] The Court is uncertain how much more hand-holding could have been done in this case.[251]

Indeed, Mr. Henke appears to want it both ways. On the one hand, he criticizes Ms. Fink for not "writ[ing] [instructions] down for [him] so [he] could get a punch list done[.]"[252] On the other hand, when given specific tasks to get done, he fails to

---

[245] Mar. 1 Tr. at 21:15-19 ("She mentioned that she's done 700, blah, blah, blah, or something along those lines, and then it later came up that this is her first receivership. And I believe that it being her first receivership, that Action Security has been a receiver of her lack of experience.").

[246] *Id.* at 79:18 ("I just need my hand held.").

[247] *Id.* at 20:15-22.

[248] *Id.* at 37:15-18 (Question: "You said that she verbally gave you a list of assignments that you needed to do, correct? She told you, here's X, Y and Z, do these things? Answer: She went down the list. Okay?); *see also id.* at 48:23-25 ("[T]hey sent you, a number of times, a list of things you had to do for them").

[249] Doc. 40-1; Feb. 1 Tr. at 97:2-10; Doc. 68, Exs. 9-20.

[250] Doc. 68, Exs. 9-11, 13, 15, 17-19.

[251] The Court notes that Ms. Fink and Ms. Barr even went so far as to attempt to provide IT help to Mr. Henke when his computer apparently crashed and he was unable to access his QuickBooks, an offer Mr. Henke spurned. Feb. 28 Tr. at 170:22-171:10.

[252] Mar. 1. Tr. at 40:23-24.

follow through on the assignments.

Mr. Henke also criticizes Ms. Fink because she only "met with [him for] three to four hours, and then sent a letter to the United States government saying that [he] need[s] to be shut down."[253]  In making this claim, Mr. Henke fails to appreciate that, in addition to their in-person meetings, Ms. Fink and her firm spent time preparing overdue tax returns based upon information obtained during those initial meetings.[254]  Furthermore, the record demonstrates that Ms. Fink attempted to work with Mr. Henke to carry out the receivership order, that communications during the summer of 2022 after the initial meeting appeared to be improving,[255] and that some progress was made in providing information to the IRS.  Moreover, when Ms. Fink's communications broke down several months into the relationship, Ms. Fink tasked Ms. Barr with attempting "to try to move forward with this case."[256]

Mr. Henke nevertheless insists that Ms. Fink should have spent more time with him, should have been "in his corner," and should have "showed up at [his] office and looked [him] in the eye and said, 'Let's get busy.'"[257]  But the record evidence in this case shows that Ms. Fink's attempts to work with Mr. Henke to resolve his tax problems were reasonable.  Even after filing her first status report documenting her issues with Mr. Henke and her conclusion that Mr. Henke's business was not viable, Ms. Fink agreed to continue working with Mr. Henke following his assurances in August 2022 that he was "willing and needing to resolve this matter as quickly as possible[.]"[258]  This representation spurred Ms. Barr's involvement, and her repeated phone calls and emails to Mr. Henke requesting information and access, which largely went unfulfilled.[259]

---

[253] *Id.* at 77:3-7.
[254] Feb. 28 Tr. at 107:19–108:8.
[255] *Compare id.* at 98:6-9 ("He seemed a little angry, a little upset.") *with* Mar. 1 Tr. at 33:2-13.
[256] Feb. 1 Tr. at 114:14-25.
[257] Mar. 1 Tr. at 77:7-10.
[258] Doc. 43 at 3.
[259] See *supra* notes 157-160.

1   Even after being ghosted in August 2022, Ms. Barr tried a second time to work

2   with Mr. Henke following the November 30 Status Conference.[260]  This outreach also

3   went unanswered despite the District Court's stern admonition to Mr. Henke that he

4   start communicating with Ms. Fink "a lot," and Mr. Henke's assurance that he

5   would.[261]   The Court does not fault Ms. Barr or Ms. Fink for refusing to spend

6   additional time and resources on Mr. Henke's case given Mr. Henke's unwillingness

7   to do the simple tasks asked of him, all of which were either directly ordered as part

8   of the District Court's order appointing the Receiver,[262] or clearly consistent with

9   the duties of the Receiver.[263]

10      All in all, Ms. Fink and Ms. Barr did not, as Mr. Henke claims, sit back and

11   "throw[] darts at [him]."[264]  Rather, Ms. Fink and Ms. Barr repeatedly attempted to

12   engage with Mr. Henke and fulfill the mandate of the District Court's receivership

13   order, yet Mr. Henke failed to cooperate.  In light of Mr. Henke's stonewalling, it is

14   understandable that Ms. Fink would ultimately throw her hands up and walk away.

15   The fault is not with Ms. Fink for failing to throw a lifeline to Mr. Henke; the failure

16   is with Mr. Henke for not grabbing that lifeline when it came his way.[265]  Mr. Henke's

17   refusal to acknowledge this while continuing to blame Ms. Fink does not indicate any

18   

19   [260] Mar. 1 Tr. 47:6-22.
    [261] Nov. 30 Tr. at 9:1-3.
20   [262] *Compare* Doc. 37 at 5 ("The Receiver shall have access and control over Action Security's
    records, including...and electronically kept records such as those using QuickBooks.") *with*
21   Doc. 68, Exs. 9-13, 15, 17-20 (Emails from Ms. Barr to Ms. Henke requesting access to, among
    other things, QuickBooks backup, login and password, and access.).
22   [263] *Compare* Doc. 37 at 12 ("The Receiver may...implement such accounting and control
    procedures to facilitate the efficient and proper administration of Action Security.") *with*
23   Doc. 68, Ex. 9-13, 15, 17-20 (Emails from Ms. Barr to Ms. Henke requesting that an inventory
    of Action Security's assets be completed.).

24   [265] The Court notes the irony of Mr. Henke's complaints about Ms. Fink refusing to work
    with him given that nearly every stage in this case it has been Mr. Henke who has missed
25   deadlines or failed to show for meetings.  Mr. Henke failed to answer the Complaint.  During
    Mr. Henke's communications with the IRS about the stipulated injunction, he failed to
26   respond with proposed edits to the injunction by the time he said he would.  RO Johnson
    testified that Mr. Henke cancelled a meeting at the last minute and failed to follow-up like
27   Mr. Henke said he would.  Ms. Fink testified that it took multiple calls over several weeks to
    set up her initial meeting and follow-up meeting with Mr. Henke.   Mr. Barr's
28   communications with Mr. Henke demonstrate that he consistently failed to respond to her
    requests for information despite repeated assurances that he would.

acceptance of responsibility.  Factor four weighs heavily in favor of Plaintiff.

### v. Defendants Will Not Meet their Legal Obligations Going Forward.

Finally, the fifth factor relates to the sincerity of Defendants' assurances against future violations.[266]  As detailed above, Mr. Henke has repeatedly assured the IRS, the Receiver, and the District Court that he wanted to resolve this matter and was working diligently toward that end.  For instance, in his emails with the IRS in August 2019 prior to the stipulated injunction, Mr. Henke wrote that he "plan[ned] on resolving this issue myself with your office's help."[267]  In his declaration filed August 16, 2022, in response to Ms. Fink's first status report, Mr. Henke claimed that Action Security's sales had increased "at the rate of 40%-50%...[a]llowing opportunity to repay IRS debt."[268]  At the November 30 Status Hearing, Mr. Henke told the District Court that he was "back on [his] feet again and...able to start getting this resolved."[269]  At the evidentiary hearing Mr. Henke testified that he was "on target" and "bound and determined to pay back everything [he owed]."[270]  Mr. Henke added that he would "continue to do what [he's] doing so that the company can be profitable and [he] can pay off [his] debt."[271]

The evidence demonstrates that what Mr. Henke has done since at least 2014 is avoid paying his taxes.  And since at least 2016, he has failed to work with those who have attempted to help him resolve these issues, despite his representations to the IRS, the District Court, and this Court at every turn that that was his desire.  Simply put, there is no evidence in the record of Mr. Henke making any sustained, dedicated attempt to comply with his legal obligations, comply with the obligations in the Stipulated Injunction, or comply with this District Court's orders and admonitions.  And there is nothing to indicate that if given another opportunity, he

---

[266] *Harkins*, 355 F. Supp. 2d at 1181.
[267] Doc. 16-1 at 7.
[268] *Id.*
[269] Nov. 30 Tr. at 4:16-17.
[270] Mar. 1 Tr. at 56:7-9.
[271] *Id.* at 85:1-2.

Report and Recommendation                                    39
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 39 of 50

would do so.

Mr. Henke's actions, and in some instances his inactions, speak louder than his words and tell the Court that without stringent sanctions, future tax violations will occur and Defendants will continue to violate the Court's orders. Without evidence of any significant good faith efforts by Defendants during the four years since entry of the Stipulated Injunction, the Court struggles to see how any remedy short of shutting down Defendants' business and enjoining Mr. Henke from engaging in any other businesses that would make him responsible for tax compliance could prevent future loss. "[T]ime and experience" have demonstrated to this Court that the previous injunction was not enough to compel Mr. Henke to bring his company into tax compliance and to stop the pyramiding scheme.[272] The District Court has been unable to accomplish its objectives with less stringent sanctions. The fifth factor, therefore, weighs in favor of Plaintiff.

In sum, Plaintiff presented evidence demonstrating there is a likelihood of future tax violations by Defendants. Plaintiff estimates that, as of July 10, 2022, Defendants owe the United States Treasury approximately $4,467,738.53, accounting for both the underlying $1,896,140.97 in unpaid taxes and the interest and penalties that have accrued on that sum.[273] Because of Defendants' conduct (or lack thereof), there is no sign this amount will decrease. Plaintiff likewise presented evidence of Defendants' past conduct of knowingly and continuously acting in a manner that violates federal tax laws, despite the repercussions, offers of assistance by the IRS and the Receiver, and numerous warnings from the IRS and District Court. Plaintiff also presented evidence of Defendants' persistent and obstinate refusal to comply with both the federal tax laws, and the District Court's preliminary injunction and receivership order, again despite numerous warnings. Mr. Henke has not acknowledged the illegality of his conduct, nor has he credibly denied any of the

---

[272] *See United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249 (1968).
[273] Doc. 45 at 2-3; Doc. 68, Ex. 5.

factual allegations against him. Plaintiff has therefore shown that a permanent injunction is appropriate for the enforcement of the internal revenue laws.

### vi. The Equitable Factors Warrant a Permanent Injunction.

In addition to showing that a permanent injunction is appropriate for the enforcement of the internal revenue laws, Plaintiff has established each of the factors that would warrant a permanent injunction in equity: (1) substantial irreparable harm; (2) the inadequacy of remedies at law; (3) actual success on the merits; and (4) a balance of equities tipping in Plaintiff's favor.[274]

First, Plaintiff has shown that Defendants' activities, if not curbed, will result in substantial irreparable harm through lost revenues and interference with the proper administration of the revenue laws. Second, Defendants' failure to make any dent in their steadily growing tax debt, and their apparent unwillingness to tackle the problem despite being subject to various court orders, indicate that remedies at law are inadequate to compel Defendants' compliance with the revenue laws. Third, Plaintiff has demonstrated actual success on the merits. As detailed above, there is abundant evidence in the record of Defendants' refusal to comply with the revenue laws or to cooperate with the District Court's orders, or to otherwise reform their business in an attempt to stop pyramiding debt and repay it.[275] And fourth, Plaintiff has shown that the balance of hardships tips in its favor. Although the Court recognizes that Plaintiff's requested relief places a significant burden on Defendants' freedom of contract,[276] Defendants' own behavior—namely, their repeated violations of the revenue laws and challenges to court orders—has prompted the necessity of a severe sanction. Permanent injunctive relief advances the significant public interest in collecting and recovering tax obligations, or, in this case, imposing appropriate sanctions where Defendants have flagrantly disregarded their duty to address these

---

[274] *See eBay Inc.*, 547 U.S. at 391; *Amoco Prod. Co.*, 480 U.S. at 546 n.12; *Drakes Bay Oyster Co.*, 747 F.3d at 1092.
[275] *See supra* sections IV.iii & v.
[276] *See infra* Part V.a.

obligations.[277]

The Court therefore finds that the traditional equitable factors further establish that Plaintiff is entitled to a permanent injunction.

## V.    SANCTIONS

### a. The Court Recommends Closure of Action Security and Enjoining Mr. Henke from Controlling a Business.

Having recommended that Defendants be found in contempt, the Court turns to the appropriate remedy. The government seeks a permanent injunction ordering Defendants to cease accepting new clients within 30 days, cease operating within 120 days, and placement of a notice of the injunction on Defendants' store door. The government also requests that this injunction prohibit Mr. Henke from directly or indirectly owning, controlling, managing, operating, or serving as an officer or director of any business until the earlier of (1) his successful petition for relief if certain conditions are met after one year from the injunction, or (2) 10 years. Finally, the government asks that the injunction provide that Defendant be incarcerated for three or more days if he violates its terms.[278]

Mr. Henke requests the appointment of a second receiver and an opportunity to continue operating the business.[279]

The government's requested remedy is extraordinary. The Court has been able to find only a limited number of cases in which a court not only ordered an individual or entity facing similar issues to dissolve their business operation, but also enjoined any future operations.[280] Indeed, such an extraordinary resolution directly impacts Defendants' clients, third parties who are wholly innocent in this

---

[277] *See Perez v. Ledesma*, 401 U.S. 82, 108 (1971) ("Taxes are the lifeblood of government, and their prompt and certain availability an imperious need.").

[278] Doc. 87 at 31-32.

[279] Doc. 88 at 1-2.

[280] *See, e.g.*, *United States v. ITS Fin., LLC*, 592 Fed. App'x 387, 397 (6th Cir. 2014); *United States v. Ireland*, 2019 WL 3759533 (E.D. Mich. July 24, 2019) (permanently enjoining defendant from acting as tax preparer and owning and operating a tax preparation business); *United States v. Pugh*, 717 F. Supp. 2d 271, 302 (E.D.N.Y. 2010); *United States v. Franchi*, 756 F. Supp. 889, 893 (W.D. Pa. 1991).

matter, and also appears to run counter to the Constitutional guarantees of liberty and freedom of contract.[281]

However, as the limited case law in this area demonstrates, those guarantees are not absolute. And Defendants' conduct in this case leaves this Court no viable option but to concur with the government's proposed sanction. Mr. Henke has repeatedly violated the lawful orders of the District Court, even after being warned that failure to abide could result in the very sanction being recommended at this time. The Court finds that no lesser sanction will deter Defendants from continuing to commit willful violations of the tax laws and the District Court's orders.

### b. Other Sanctions Are Not Appropriate in this Case.

The Court has considered other sanctions ranging from doing nothing to recommending Mr. Henke's incarceration. A recommendation to maintain the status quo ignores two obvious truths. First, Ms. Fink has provided her notice of resignation and is no longer available to serve as a receiver.[282] Second, such an order would grant Mr. Henke additional time to continue with his tax avoidance, rewarding him for his obstinacy and deliberate avoidance of his obligations under the law, the injunction, and the District Court's orders.

The appointment of a second receiver, as requested by Mr. Henke, is also not a viable option. Defendant refused to work with Ms. Fink or Mr. Barr, and since Ms. Fink's resignation, there is no evidence in the record of any meaningful attempts by Defendant to comply with the tax laws or pay what is owed. There is no evidence in the record that appointing a second receiver – a step that would amount to "do-over" – would be effective. The District Court appointed a competent and capable receiver to work with Defendants to assist with the resolution of their tax issues. As detailed above, Mr. Henke ultimately refused this help, spurned the Receiver, and

---

[281] *See* Const. art. I, § 10.
[282] Doc. 73-1.

blamed the Receiver and the District Court for his predicament. Given Defendants' history, appointment of a second receiver is very likely to end in a similar fashion.

Mr. Henke also seeks to work with an outside firm. In his final briefing to this Court, Mr. Henke provided a letter from a service which appears to indicate that the service has been retained to assist with Defendants' ongoing tax problems. However, as previously stated, the apparent retention of this firm does not alter the Court's recommendation. Mr. Henke has frequently misled the Court as to his retention of professionals that he claimed were assisting him or were going to be retained to assist him.[283] Given Mr. Henke's record with the Receiver, the Court has doubts about whether Mr. Henke will follow through with this firm or how effectively he will be able to work with them to address his significant tax delinquency.

Financial penalties are an option that the Court has considered and similarly rejected. In its original motion for a show cause order filed on October 14, 2020, the government requested a per diem fine, along with compensation for costs accrued by the government because of Defendants' contemptuous behavior.[284] Such a per diem fine for each day a contemnor fails to comply with an affirmative court order is valid and enforceable.[285]

The Court finds that a financial penalty to induce compliance would be ineffective. This is so because Mr. Henke has already demonstrated that he prioritizes paying himself and his vendors over his taxes, even when the law and District Court tell him otherwise.[286] Furthermore, at best, a per diem fine would likely induce only temporary compliance before Defendants reverted to past practice

---

[283] *See supra* notes 196, 199.
[284] Doc. 20 at 13. The government withdrew this request for financial penalties in its Response to Order dated January 26, 2022. Doc. 26. In that order, the District Court solicited soliciting "input from Plaintiff as to what action the court should take to enforce [the injunction.]" Doc. 25.
[285] *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999).
[286] *See* Feb. 28 Tr. at 19:2-7; *see also* Mar. 1. Tr. at 72:14-24.

of ignoring the Court's order, failing to pay taxes, and failing to cooperate with a receiver. The parties would then find themselves right back where they began with the filing of this motion. Moreover, where the fundamental issue is an individual's refusal to properly pay taxes owed, it makes little sense to the Court to order a person to pay money to the Court as part of a civil contempt fine, as opposed to where that money should be sent, the IRS.[287]

The Court has also considered a shorter duration for the permanent injunction, or alternative conditions for lifting of the injunction after one year. The Court finds that a shorter term for the injunction and alternative conditions are not appropriate. This is so given the duration and magnitude of the willful tax avoidance by Defendants, and Defendants' unwillingness to comply with multiple prior orders and instructions of the District Court. A 10-year injunction and the imposition of strict conditions that must be met prior to an early release from that injunction are appropriate under the facts of this case.

The Court has also considered incarceration as a sanction. Incarceration is an appropriate coercive sanction for civil contempt so long at "the contemnor can avoid the sentence imposed on him, or purge himself, by complying with the terms of the original order."[288] The government is not seeking incarceration in this civil matter and the Court is not recommending it.

The Court finds that anything less than the recommended sanction on these facts would undermine the authority of the District Court. On two occasions the District Court has clearly warned Mr. Henke of the consequences of failing to comply with its order. When ordering the Stipulated Injunction – to which Mr. Henke voluntarily agreed – the Court wrote that violating its order could result in Mr. Henke and Action Security being ordered to "cease doing business immediately" and

---

[287] *But see United States v. Moore*, No. 16-6054, 2017 WL 3718529 at 4 (D. N.J. Aug. 29, 2017) (denying permanent injunction seeking closure of dental office in part because motion was "premature" and "cut[] off [Defendant's] only real chance to repay his and practice's liabilities").

[288] *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 635 n. 7 (1988).

being "permanently enjoined from forming, incorporating, or owning another business entity and working for any business in [any tax-related capacity.]"[289] Similarly, in the Appointment Order, the District Court wrote, "[i]f the Receiver is unable to cure those violations and determines that Action Security is unable or unwilling to comply . . . the United States shall immediately seek the permanent closure of Action Security."[290]

It does not appear that the incentives that might motivate a businessperson to work with a receiver or otherwise take the necessary steps to comply with the law and the Court's orders work with Mr. Henke. The initial involvement of the IRS failed. The Stipulated Injunction failed. The District Court's receivership order failed. The filing of the government's motion seeking closure of Defendant Action Security and a permanent injunction against Mr. Henke forbidding him from owning or operating a similar business for 10 years failed. The looming threat of this Court's potential finding and recommendation granting the government's motion and proposed remedy failed.

Nothing has prevented Mr. Henke from recognizing the seriousness of his dilemma and taking advantage of the opportunities provided to him by the IRS, the District Court, and Ms. Fink. However, since breaking off contact with the Receiver, there is nothing in the record demonstrating that Defendants have taken any steps to comply with the District Court's orders. Defendants' inaction has occurred in spite of the fact that *any* positive steps by Mr. Henke toward complying with the District Court's order would likely have been viewed favorably and would in no way have harmed his position in this litigation.

In the Court's view, Mr. Henke did not want to be told by anyone – the IRS, the District Court, or Ms. Fink – how to run his business. However, that is precisely what the District Court ordered. There is nothing in the record indicating that Mr.

---

[289] Doc. 19 at 5.
[290] Doc. 37 at 5.

Report and Recommendation 46
*United States of America v. Action Security, et al.*
Case 3:19-cv-00134-JMK-KFR   Document 91   Filed 01/10/24   Page 46 of 50

Henke's mindset has changed and that any action short of what is recommended herein will be any more successful.

Mr. Henke expressed the opinion that, "[Action Security] is not a business that you just can dissolve."[291] Unfortunately for him, that is simply not true. The District Court can dissolve Action Security for Defendants' nine-year streak of violating IRS tax laws and failing to comply with multiple court orders. That is why this Court recommends Action Security be dissolved and Mr. Henke enjoined from running a business until Mr. Henke can demonstrate concrete actions he has taken to ensure he can comply with the tax laws.

## VI.  CONCLUSION

For nearly a decade, Defendants have defied taxation with impunity. As of July 10, 2022, Action Security's pyramiding tax debt totaled $4,467,738.53, with no sign of decreasing despite numerous offers and directions of help from the District Court, the IRS, and the Receiver. Defendants have not shown any willingness to respect our nation's tax laws or the District Court's authority. And Mr. Henke's promises of change ring hollow. Mr. Henke's actions during this case demonstrate that he will not reform and that the Court should grant Plaintiff's Motion for Sanctions to Dissolve Action Security.

Defendants have been warned countless times that Action Security may be shut down and that Mr. Henke might be enjoined from running a business if they did not comply with tax laws, work with the Receiver, or follow court orders. These warning were given upon commencement of this action by the IRS, with the filing of the Stipulated Injunction, with the Appointment Order, throughout Defendants' correspondence with Plaintiff, and by the District Court. This Court therefore sees no feasible lesser remedy at this stage.

---

[291] Doc. 43 at 3.

Accordingly, this Court recommends that the District Court **GRANT** Plaintiff's Motion for Sanctions to Dissolve Action Security and **ORDER** a permanent injunction containing the following provisions:

1. Scott Henke and Action Security shall cease accepting new clients within 30 days;

2. Action Security shall cease operating as a going concern within 120 days. After that time, it may not, under any circumstance, perform services for existing clients, sell products, or advertise to the public;

3. Within three days of service of the District Court's order, Mr. Henke shall conspicuously display at Action Security's entrance a copy of this injunction and a notice that the business will close by the date ordered which shall include the following language;

> Due to Action Security's failure to pay taxes and comply with court orders, the District Court for the District of Alaska has found Action Security and its owner, Scott Henke, in contempt of court. As a result of being found in contempt, the District Court has entered a permanent injunction against Action Security and Scott Henke. Action Security and Scott Henke shall cease accepting new clients within 30 days of the date of the District Court's injunction and shall close its doors within 120 days of that injunction.

4. Mr. Henke shall not directly or indirectly own, control, manage, operate, or serve as an officer or director of any business until the earlier of (1) his successful petition for relief under paragraph 5; or (2) 10 years;

5. Mr. Henke may petition the Court for relief from this Permanent Injunction, no earlier than one year after its entry, by demonstrating that he is capable and likely to run a business in compliance with all federal tax laws. In reviewing any petition for relief, the Court may consider, among other factors, whether:

    a. A certified public accountant approved by the Court, or by the United States, attests that Mr. Henke has implemented sufficient internal

controls to ensure that all future federal taxes are reported and paid on time;

    b. Mr. Henke has reported and paid his own federal income taxes, in full and on time, for the past five years;

    c. Mr. Henke has reported and paid any state and local taxes due, in full and on time, for the past five years;

    d. Mr. Henke owes no outstanding debts; and

    e. Mr. Henke has maintained a positive credit history; and

6. If Mr. Henke violates this injunction, he shall be incarcerated for up to three days, or for as long as the contempt remains.

The Court also recommends that:

1. As recommended by Ms. Fink at Docket 48-1, the receivership ordered at Docket 37 be terminated; and

2. Ms. Fink's request to resign at Docket 73-1 be GRANTED.


DATED this 10th day of January, 2024 at Anchorage, Alaska.


                         *s/ Kyle F. Reardon*
                         KYLE F. REARDON
                         United States Magistrate Judge
                         District of Alaska

**NOTICE OF RIGHT TO OBJECT**

Under 28 U.S.C. § 636(b)(1), a district court may designate a magistrate judge to hear and determine matters pending before the Court. For dispositive matters, a magistrate judge reports findings of fact and provides recommendations to the presiding district court judge.[292] A district court judge may accept, reject, or modify, in whole or in part, the magistrate judge's order.[293]

---

[292] 28 U.S.C. § 636(b)(1)(B).
[293] *Id.* § 636(b)(1)(C).

Report and Recommendation
*United States of America v. Action Security, et al.*
           49
Case 3:19-cv-00134-JMK-KFR    Document 91    Filed 01/10/24    Page 49 of 50

A party may file written objections to the magistrate judge's order within 14 fourteen days.[294]  Objections and responses are limited to five (5) pages in length and should not merely reargue positions previously presented.  Rather, objections and responses should specifically identify the findings or recommendations objected to, the basis of the objection, and any legal authority in support.  Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment.[295]

---

[294] *Id.*
[295] *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).